UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICHAEL ANDREW MARTINEZ,<br><br>                    Plaintiff,<br><br>v.<br><br>SAGE ALBRIGHT, BRANDON ANDERSON, and the CITY OF IDAHO FALLS,<br><br>                    Defendants. | Case No. 4:23-cv-00211-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Defendants Sage Albright, Brandon Anderson, and the City of Idaho Falls's (collectively "Defendants") Motion for Summary Judgment. Dkt. 33.[1] Plaintiff Michael Martinez opposes the Motion. Dkt. 43.

The Court held oral argument on July 17, 2025, and took the Motion under advisement. Upon review, and for the reasons set forth below, the Court GRANTS Defendants' Motion for Summary Judgment.

## II. BACKGROUND

### A. Factual Background

On September 25, 2021, Martinez was at home in Idaho Falls with his wife, Marcy

---

[1] This is, in fact, an Amended Motion for Summary Judgment. Defendants originally filed their Motion for Summary Judgment on July 27, 2023. Dkt. 12. Pursuant to Federal Rule of Civil Procedure 56(d), Martinez petitioned the Court to defer ruling until discovery was complete. Dkt. 16. The Court ultimately granted Martinez's motion. Dkt. 25. Discovery concluded, and Defendants re-filed their motion. Dkt. 33.

Ker ("Ker") when she called the police to report a domestic disturbance. Ker told the 911 operator she needed an officer at her home right away because Martinez was yelling, breaking things, and threatening her. Dkt. 12-5, Ex. A.[2] When asked by the 911 operator if Martinez had any weapons, Ker indicated that Martinez always had weapons and that seven guns were in the house.

Ker locked herself in her vehicle to make the 911 call. During the initial moments of the call, Martinez can be heard shouting in the background. At some point during the call, Ker exited her vehicle and walked back into the house. Her and Martinez can be heard arguing in the background.

Idaho Falls Police Sergeant Sage Albright was the first to arrive on scene. Ker was still on the 911 call when he arrived. Prior to his arrival, Albright had been advised by dispatch that he was responding to a domestic disturbance call that included threats of violence towards the caller (Ker) and threats of destruction of property. Dispatch also told Albright that the alleged perpetrator (Martinez) owned firearms.

When Albright arrived, Ker exited the home while Martinez remained on the porch.[3] Albright did not speak directly with Ker or ask about her physical condition but instead engaged Martinez in conversation.

Martinez began by asserting "this is my fu*king house." Dkt. 12-5, Ex. B, at 00:17.

---

[2] As part of their original Motion for Summary Judgment, Defendants submitted Exhibits A, B, and C which are audio and video recordings of the encounter on September 25, 2021. *See generally* Dkt. 12-5. These were provided to the Court on a flash drive.

[3] Throughout this initial conversation, Martinez held his screen door open and stood with one foot inside his home and one foot outside his home.

Martinez then loudly (and profanely) explained that Ker had taken the keys to his vehicles and his business and as soon as he got his keys back, he would leave.[4] When Albright tried to defuse the situation, Martinez responded, "I have fu*king zero tolerance for this bullsh*t! I want my fu*king keys!" *Id*. at 00:24-00:28. Albright asked Martinez to work with him. Martinez refused, stating: "I'm telling you right now: get my fu*king keys or there's gonna be fu*king hell!" *Id*. at 00:37-00:43.

Further attempts at de-escalation were met with similar comments such as "I'm fu*king done," and "that's all you're getting out of me! Cuz I am not fu*king playing games, dude! I will fu*king yard sale this whole mother fu*ker dude! You have no idea!" *Id*. at 1:08-1:10, 1:27-1:37. Ker then said something to Martinez to which Martinez responded: "shut your fu*king mouth and let me fu*king talk to him [referring to Albright]!" *Id*. at 1:38-1:41. Albright moved himself between Martinez and Ker.

Idaho Falls Police Officer Brandon Anderson then arrived on scene and engaged with Ker. Albright asked Martinez to "dial it back." *Id*. at 1:45. Martinez repeated he was "not fu*king playing dude!" and asked, "do you know who the fc*k I am?!" *Id*. at 1:58-2:00. Albright responded he did not know who Martinez was and asked if there was a reason he should know who Martinez was to which Martinez responded "probably." *Id*. at 2:02–2:06. Martinez then began walking back inside the house.

Albright and Anderson followed Martinez into his home despite Martinez shouting that officers were not welcome. Martinez then began moving about inside the house. Not

---

[4] Although he appeared intoxicated, Martinez contends he did not intend to drive away from the scene, but that he had already called a friend to give him a ride. Dkt. 43-1, at 3.

knowing Martinez's intentions, Albright ordered Martinez to stop what he was doing and talk to them. Martinez refused. According to Defendants, Martinez then took a "defensive position,"[5] and continued to berate the officers and ignore their verbal commands.

At that point, Albright attempted to grab Martinez's left arm to place him under arrest. Martinez pulled back, resisted, and swung his arms at Albright. Both officers then warned Martinez he would be tased if he did not comply. Albright grabbed at Martinez's arms and shirt to bring him under control, but Martinez again resisted. Anderson then shouted "Taser! Taser! Taser!" before deploying his taser in dart mode.[6] *Id*. at 2:21–2:22.

After Anderson deployed his taser, Albright moved closer to Martinez to secure his arms and place him in handcuffs. Martinez, however, fought against the taser and ripped the taser probes out of his skin continuing to struggle and resist. He lunged at Anderson who then deployed his taser a second time.

During the struggle, Ker inserted herself into the fray, but Anderson was eventually able to remove her from the tussle. Albright was then able to get sufficient hold and control of Martinez.[7] Martinez continued to resist. Anderson pressed his taser against the bare skin

---

[5] Martinez disputes that his stance and posture were defensive or aggressive in any way.

[6] In dart mode, a taser propels two electronically charged darts towards the target causing muscle spasms and incapacitation.

[7] Martinez alleges that Albright then placed him in a "rear naked choke hold." Dkt. 43-1 at 4. During the melee, it appears someone bumped the light switch in this area of the home turning off the lights. Albright and Martinez ended up in a dark hallway or entryway at that point. It does appear that Albright had Martinez in some type of hold from behind, but it is difficult to see in the darkness. Regardless, whatever force was used to subdue Martinez took roughly 20 seconds. Dkt. 12-5, Ex C. 1:03-1:20.

of Martinez's back in preparation for using the taser in drive stun mode.[8] At that point, Albright and Anderson placed Martinez under arrest.

Martinez was treated for his injuries at the scene and later by other medical professionals. He was charged with misdemeanor resisting/obstructing; however, the charges were later dismissed.

### B.  Procedural Background

On April 29, 2023, Martinez filed a Motion to Waive Bond. Dkt. 1. The Court granted the motion in part by requiring a nominal bond in the amount of $500. Dkt. 2. The Court received Martinez's bond on May 15, 2023, and on May 17, 2023, Martinez filed his Complaint. Dkt. 4.

Martinez does not delineate his causes of action in his Complaint.[9] As best the Court can surmise, Martinez's claims consist of: (1) unlawful search and seizure and excessive force under the Fourth and Fourteenth Amendments (Dkt. 1, ¶ 15, 16); (2) unlawful prosecution and retaliation in violation of the First Amendment (*Id.* at ¶ 18); (3) a right to bear arms under the Second Amendment (*Id.*); (4) state law negligence and trespass claims (*Id.* at ¶ 17): and (5) respondent superior liability under *Monell*[10] as against the City of Idaho Falls (*Id.* at ¶ 22–24).

As already noted, *see supra* note 1, Defendants filed an early Motion for Summary

---

[8] Drive stun mode refers to pressing the taser directly against the body of the target and activating the electric charge.

[9] As the Court previously noted, numbered causes of action are not, per se, required. However, it is helpful for clarity and organizational purposes. *See* Dkt. 25, at 3 n.1.

[10] *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

Judgment. Dkt. 12. However, upon Martinez's motion to defer, the Court postponed ruling until the parties had a chance to complete discovery. Dkt. 16.

Discovery did not go smoothly. Overlapping and missed deadlines, disagreements, miscommunications, and a lack of diligence plagued the completion of discovery and even briefing on the instant motion. The Court issued multiple decisions addressing these issues. Dkts. 30, 38, 40. Ultimately, however, briefing concluded, the Court held oral argument, and the matter is now ripe for adjudication.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Id.*

To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion

for summary judgment; rather the respondent must set forth "specific facts," supported by evidence, with "reasonable particularity" to preclude summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

## IV. ANALYSIS

Owing to the lack of numbered causes of action, the parties addressed the issues in broad categories. Those categories did not precisely line up with each other. Nevertheless, the Court will follow the general tenor of the parties' briefs evaluating the legal arguments in turn.

### A. Constitutional Rights / Warrantless Entry

Defendants first move for summary judgment on all of Martinez's constitutional claims asserting their actions were justified and reasonable under various exceptions to the Fourth Amendment's general prohibition against unlawful searches and seizures.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "At [its] very core stands the right of a [person] to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States,* 365 U.S. 505, 511 (1961). "This 'special protection' of the home 'as the center of the private lives of our people' reflects an ardent belief in 'the ancient adage that a man's house is his castle to the point that the poorest man may in his cottage bid defiance to all the forces of the Crown.'" *Bonivert v. City of Clarkston*, 883 F.3d 865, 873 (9th Cir. 2018) (quoting *Georgia v. Randolph*, 547 U.S. 103, 115 (2006)). For that reason, it is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a

warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).

Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions. The Supreme Court has held, for example, that law enforcement officers may make a warrantless entry onto private property to fight a fire, prevent the destruction of evidence, or if in "hot pursuit" of a fleeing suspect. *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). The Supreme Court has also held that "exigent" circumstances—such as assisting a person who is seriously injured or preventing someone from becoming seriously injured—qualify as a permissible exception. *See, e.g., Mincey v. Arizona*, 437 U.S. 385, 392 (1978) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." (cleaned up)).

In this case, Defendants assert their warrantless entry of Martinez's home was permissible under the "emergency aid" exception and/or the "exigent circumstances" exception. While similar, the Court will address each exception in turn.

*1. Emergency Aid Exception*

The emergency aid exception applies when: "(1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008).

In this case, Albright and Anderson had an objective and reasonable belief Ker, or themselves, could be in danger. Entering the home to protect Ker (and themselves) from

MEMORANDUM DECISION AND ORDER - 8

harm was, therefore, reasonable.

Begin with the 911 call. Ker reported that Martinez had "gone berserk and he's breaking things and he's threatening me." Dkt. 12-5, Ex. A, at 00:05-00:07. Ker continued: "My husband's threatening me. He's threatening to beat me and he's breaking things in our home." *Id*. at 00:23-00:26. Ker also confirmed during the call that Martinez owned weapons including "seven guns in [the] home." *Id*. at 01:51.

Next, consider the Parties' interactions once officers arrived. The footage of the initial conversation between Martinez and Albright is short and it is clear Martinez was agitated and disrespectful. By the Court's count, Martinez used the f-word twenty-six times in the span of the 2 and a half minutes he was speaking to officers Albright and Anderson.[11] Albright interpreted some of this language as a direct threat to Ker or himself. For example, when Ker tried to say something to Martinez, he pointed his finger at her and yelled, "shut your fu*king mouth and let me fu*king talk to him!" Dkt. 12-5, Ex. B, at 1:38-1:41. Albright moved himself between Martinez and Ker at that point stating he did so because he "considered Martinez to be a potential threat to Ker." Dkt. 33-4, at 3. As for himself, when Albright tried to deescalate the situation, Martinez's yelled, "I'm telling you right now: get my fu*king keys or there's gonna be fu*king hell!" Dkt. 12-5, Ex. B, at 00:37-00:43. Albright stated he "understood that [language] to be a threat and that Martinez would cause further damage or attempt to cause harm to [Albright] or Ker if [Martinez] did not

---

[11] The Court is not implying that the repeated use of the f-word, in itself, creates danger. That said, strong, obscene language—said in a raised voice no less—is indicative of increased emotion, escalation, and intensity.

get his keys back . . . ." Dkt. 33-4, at 3.

Ultimately, when Martinez retreated into his home, Albright "was concerned that [Martinez] would escalate the situation and cause harm to [Albright], Officer Anderson, and/or Ker by going into his house to grab a firearm." *Id*. at 4. This concern was based on "the report of firearms inside the house, the nature of the dispute, Martinez's threats, aggressive actions, and refusal to cooperate . . . ." *Id*.

The Court finds these examples illustrate Albright and Anderson's belief that they needed to "protect others or themselves" was objectively reasonable, thus satisfying the emergency aid exception to the warrant requirement. *Snipe*, 515 F.3d at 952.

Martinez takes issue with Defendants' reliance on the emergency aid exception in two primary ways. The Court feels it is important to touch on each briefly.

First, Martinez alleges the emergency aid exception to the warrantless entry of a home should only be applied in circumstances where the imminent injury was unfolding "in the place to be entered." Dkt. 43, at 4. In other words, Martinez contends that because Ker (and the officers) were *outside* of the home, there was no emergency *within* the home and, therefore, the officers had no right to follow him *into* the home. Martinez largely relies on *Bonivert*, a case in which the Ninth Circuit emphasized that, in all of their decisions "involving a police response to reports of domestic violence," each situation "required an objectively reasonable basis for believing that an *actual or imminent injury* was unfolding in the place to be entered." 883 F.3d at 877 (emphasis in original). The Circuit emphasized that while domestic abuse is a serious problem, those types of situations do not, standing alone, create a "per se emergency justifying warrantless entry." *Id*. Finding "no objectively

reasonable basis to suggest [the defendant in that case] could harm" another person, the Circuit concluded the emergency aid exception did not apply under those particular facts. *Id.* at 878.

*Bonivert*, however, is distinguishable from the present circumstances. In *Bonivert*, there was no indication or evidence suggesting ready access to firearms (or weapons of any kind) and no objective evidence the defendant "could harm" anyone else. *Id*. at 877. The Ninth Circuit itself noted that the record in *Bonivert* "st[ood] in stark contrast to any other case in which we have held, under the emergency aid exception, that officers responding to reports of a domestic dispute had 'an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm.'" *Id*. at 878 (citing *Snipe*, 515 F.3d at 952).

In this case, Defendants knew Martinez owned firearms. They also had reports that he had been physically aggressive towards Ker and was breaking things in the home. And Defendants themselves were on the receiving end of Martinez's abusive language and threats once they arrived. These facts are more egregious than those at issue in *Bonivert* and support a finding that Defendants' decision to enter the home here were objectively reasonable. *See Michigan v. Fisher*, 558 U.S. 45, 49 (2009) ("Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception.").[12]

---

[12] Martinez also cites to another Ninth Circuit case—*U.S. v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005)—and summarizes in a parenthetical that "exigent circumstances did not justify officer's warrantless entry into home where officer responded to domestic violence report and domestic violence victim was out front of the home." Dkt. 43, at 4–5. This is an accurate summary of *part* of that decision. However, the Ninth Circuit clearly explained that, while "the exigency doctrine does not provide a constitutional basis

(continued)

Second, Martinez objects to any consideration of his firearm ownership in determining whether Defendants were objectively reasonable in their belief that they needed to render emergency aid. He claims the fact that a person owns firearms does not, standing alone, provide justification for a warrantless entry into a home.[13] Fair enough. But here, the fact that Martinez owned firearms did *not* stand alone. In addition to Martinez's firearm ownership, the officers based their belief on the reports they received from dispatch of an actively violent dispute, as well as their own observations of Martinez's behavior and demeanor on scene. The cases Martinez cites in support of his argument lack any of the attending circumstances present here—allegations of abuse, observations of threats, violence, etc.[14]

---

for the warrantless entry *in this case*, the emergency doctrine provides justification" because the officer believed there was an "emergency at hand and an immediate need for his assistance for the protection of life or property." *Martinez*, 406 F.3d at 1165. Accordingly, this case, in full context, is not as helpful to Martinez as he asserts.

[13] Defendants themselves do not outright disagree with Martinez on this point. *See* Dkt. 33-1, at 4 ("It is important to note that Defendants are not arguing that they could have entered Martinez's home at any point during their interaction or simply because Ker reported a domestic disturbance. Rather, Albright only entered the home after Martinez made several threats to Albright and Ker, became increasingly aggressive, and then retreated into his home where it was reported he had access to seven firearms.").

[14] For example, Martinez cites *United States v. Gooch*, and its finding that "the presence of a firearm alone is not an exigent circumstance." 6 F.3d 673, 680 (9th Cir. 1993). In that case, the police engaged in the warrantless search of a tent based on a report that there may have been a firearm inside. Critically, the owner of the tent *was already in custody* when the police searched the tent. The Circuit found those circumstances were not emergent because the defendant was under arrest and the area could easily be secured while officers sought a warrant. But here, Martinez *was not* in custody at the time of the warrantless entry. Martinez also cites a footnote in *LaLonde v. County of Riverside*, where the Ninth Circuit states "[t]he mere fact that a person owns a rifle and does not like law enforcement officials does not in itself allow police officers to enter the person's home and seize him" without a warrant. 204 F.3d 947, 958 n. 16 (9th Cir. 2000). That footnote, however, is attached to the following sentence from the Ninth Circuit's decision: "Based on these facts, nothing whatsoever happened to present the officers with a threat to their safety; accordingly, a reasonable officer could not have believed the entry was lawful . . . ." *Id.* This statement makes clear the individual facts of any case determine whether the officer's actions were reasonable and, furthermore, that "threats to [officer] safety" are important to the Court's analysis.

MEMORANDUM DECISION AND ORDER - 12

Martinez focuses on details in isolation—that Ker wasn't in the house, that firearm ownership isn't sufficient, that Martinez was entitled to his "free speech rights"—but the Court must consider "the totality of the circumstances." *Snipe*, 515 F.3d at 952. Doing so in this case is not difficult. When one considers the information Ker provided on the 911 call, along with the in-person interactions between officers and Martinez, it is objectively reasonable to conclude that Martinez posed a threat to Ker and/or Albright and Anderson. This was sufficient to justify Defendants warrantless intrusion into Martinez's home under the emergency aid exception.

Finally, the scope of the officers' entry was also reasonable. To meet the elements of the emergency aid exception, Defendants must show that "the search's scope and manner were reasonable to meet the need." *Oien v. Cnty. of San Bernardino*, 680 F. App'x 530, 532 (9th Cir. 2017). In this case, Albright and Anderson only entered Martinez's home as far as Martinez himself did. They did not search the entire house. The scope of their entry was limited to the area surrounding Martinez. They stayed in the living room and hallway where Martinez was eventually placed in handcuffs. The manner of their entry was also reasonable. Defendants did not break down a door or destroy a window to obtain entry into Martinez's house. They simply opened the screen door and followed Martinez inside.

For these reasons, the Court finds both elements of *Snipe* are met, and the emergency aid exception applies.

### 2. *Exigent Circumstances Exception*

Like the emergency aid exception, the exigent circumstances exception applies under "circumstances that would cause a reasonable person to believe that entry . . . was

necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005) (cleaned up). Additionally, as the Supreme Court has long emphasized, reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving . . . ." *Graham v. Connor*, 490 U.S. 386, 396–397 (1989).

Like the Court's analysis above, the analysis here turns on the specific facts of the case. Albright and Anderson were responding to a domestic disturbance where dispatch had already relayed that Martinez was "threatening to hurt [Ker]," that he was yelling and breaking things, and that there were "seven guns in the home." *See generally* Dkt. 12-5, Ex. A. Dispatch informed the officers that Ker was physically separated from her husband and was locked inside her vehicle. Before officers arrived, dispatch updated them that Martinez was right by the driver's door of Ker's car. Dispatch then reported that Ker had returned to the home and Martinez was with her.

The information the officers received from dispatch prior to arrival was largely corroborated by Albright immediately when he arrived on scene. Although Ker walked out of the home and remained outside for several minutes, the conflict was clearly not over. Martinez continued shouting and cursing the entire time Albright was present. Martinez appeared angry, agitated, and erratic—much of which was directed at Ker and the officers.

MEMORANDUM DECISION AND ORDER - 14

When Ker said something to Martinez, he turned towards her, pointed his finger at her, and shouted: "Shut your fu*king mouth and let me fu*king talk to him!" Dkt. 12-5, Ex. B, at 1:37–1:41. And as noted, Albright interpreted some of Martinez's comments towards him as threatening.

As the conversation progressed, Martinez became more agitated and was clearly antagonistic towards Ker and the officers. Once he retreated into his home, Martinez could have armed himself and shot at Ker (or the officers). The exigencies of the situation justified Albright's and Anderson's warrantless entry into Martinez's home.

In sum, the exigent circumstances exception to the warrant requirement also justified entry into Martinez's home and, therefore, the entry did not violate his constitutional rights.

### 3. Conclusion

The totality of the circumstances in this case illustrates that a reasonable officer in Albright's or Anderson's shoes could have objectively believed Martinez was retreating into his house to arm himself or otherwise take action that could have caused imminent harm to Ker or themselves. Thus, their entry into the home was reasonable under the Fourth Amendment because of the emergent and exigent circumstances present at the time.

Defendants did not violate Martinez's constitutional rights and summary judgment is appropriate in Defendant's favor on each of his constitutional claims.

### B. Qualified Immunity

Now, even assuming Albright and Anderson were incorrect in their analysis and *should not* have entered Martinez's home without first obtaining a warrant, they are entitled

to qualified immunity.

The purpose of the doctrine of qualified immunity is to shield public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Qualified immunity is designed to give government officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

In this case, Albright and Anderson did not violate Martinez's constitutional rights because their warrantless entry was justified pursuant to the emergency aid exception and the exigent circumstances exception. With no underlying constitutional violation, the qualified immunity analysis ends there. *Aguilera v. Baca*, 510 F.3d 1161, 1167 (9th Cir. 2007) ("If we determine at the first step that no constitutional violation occurred, the qualified immunity inquiry is at an end.").

Even then, Defendants are also entitled to immunity under the second prong of the test. Although Fourth Amendment analysis is well established, its application in the circumstances present in this case is less certain. As outlined above, there are assuredly cases involving domestic disturbances and warrantless searches and the interplay between these legal situations. However, the specific facts of each case are critical and the Court

nor the parties could locate a case "on all fours" with the facts present here. But even speaking more broadly, there was no specific caselaw as of September 2021—when the event occurred—that would have alerted Albright and Anderson to the fact that their actions in following Martinez into his home when they believed themselves (or Ker) could be in danger were clearly unconstitutional.

Defendants are, therefore, entitled to qualified immunity.

### C. Unlawful Arrest, Malicious Prosecution, and Retaliatory Arrest

Defendants next move for summary judgment on Martinez's allegations of unlawful arrest, malicious prosecution, and retaliatory arrest.

Searches and/or seizures are reasonable when supported by probable cause. U.S. Const. Amend. IV. Probable cause for an arrest exists where the facts and circumstances within the officer's knowledge—and of which he has reasonably trustworthy information—are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). The inquiry is not whether the suspect committed the offense. Rather, the relevant question centers on whether a reasonable officer had probable cause to think the suspect could have committed the offense. *Blankenhorn v. City of Orange*, 485 F.3d 463, 475 (9th Cir. 2007).

The existence of probable cause is a complete bar to claims for unlawful arrest, malicious prosecution, and retaliatory arrest. *See Jackman v. City Of Pocatello*, 2023 WL 4627980, at *6 (D. Idaho July 19, 2023) ("To prevail on a § 1983 claim of malicious prosecution, a plaintiff must show that the defendants prosecuted him with malice and without probable cause and that they did so to deny him equal protection or another specific

constitutional right."); *Baker v. Clearwater Cnty.*, 2023 WL 3862511, at *1 (9th Cir. 2023) ("A claim for retaliatory arrest generally fails if the arresting officer had probable cause.").

In this case, Albright and Anderson had probable cause to arrest Martinez for resisting and obstructing their investigation into Ker's report of domestic violence. Pursuant to Idaho Code, a person "who wilfully [sic] resists, delays or obstructs any public officer, in the discharge, or attempt to discharge, of any duty of his office or who knowingly gives a false report to any peace officer" is guilty of resisting and obstructing officers. Idaho Code § 18-705.

Ker reported Martinez was acting erratic and dangerous. Albright and Anderson witnessed similar conduct firsthand. These circumstances provided probable cause to assume Martinez had committed, or was about to commit, some form of domestic violence, assault, or abuse. Martinez's words and actions hindered the officers' ability to investigate, and he did so in their presence. He also ignored commands from the officers and actively fought against them.

Even viewing the facts in a light most favorable to Martinez, he clearly resisted and obstructed Albright's duty to investigate the report of an ongoing domestic disturbance by failing to engage in conversation and refusing to heed Albright's request to calm down and explain what was happening. More importantly, the video footage clearly shows Martinez ignored Albright's commands and resisted Albright's efforts to place him under arrest. The officers' investigation could not be completed due to Martinez's actions and, as a result, they had probable cause to arrest Martinez for resisting/obstructing.

The existence of probable cause is a complete bar to Martinez's claims for unlawful

arrest, malicious prosecution, and retaliatory arrest. Summary judgment is, therefore, appropriate in Defendant's favor on these claims.[15]

### D. Excessive Force

Courts use the reasonableness test of the Fourth Amendment when analyzing a claim of excessive force incident to arrest. *Graham*, 490 U.S. at 394. When weighing an excessive force claim, summary judgment is appropriate if the Court "concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was *objectively reasonable under all circumstances.*" *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) (emphasis added). When considering this question, the Court must be cognizant that all determinations of force "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 914 (quoting *Graham*, 490 U.S. at 396-97) (cleaned up). "The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, at 396.

First, the Court considers the "nature and quality of the alleged intrusion." *Id.* Second, the Court analyzes the countervailing governmental interests at stake by looking at the three *Graham* factors: (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect

---

[15] That the charge against Martinez was later dismissed does not change the Court's analysis. Prosecutors decide not to pursue charges for a variety of reasons and the dismissal of Martinez's charge in this case is not an indication the charge was legally insufficient.

was actively resisting arrest or attempting to evade arrest by flight. *Id*. Third, the Court examines the totality of the circumstances and considers whatever specific factors, beyond the *Graham* factors, are appropriate in a particular case to determine whether the force employed was constitutionally reasonable. *Id*. at 964.

### 1.   Nature and Quality of Force

In this case, the officers did not use excessive force against Martinez. The nature of the force included the use of a taser in dart mode which is an "intermediate, significant level of force." *Mattos v. Agarano*, 661 F.3d 433, 449 (9th Cir. 2011) (cleaned up). Prior to deploying the taser, both officers warned Martinez that he needed to calm down and stop resisting. Whether one calls the stance Martinez took "defensive" or not, he was clearly unwilling to submit to Albright's request, instead moving his arms away from Albright and even swinging them in Albright's direction to thwart his efforts. Considering Martinez's physical demeanor and actions, the intermediate level of force officers used was appropriate.

### 2.   Graham Factors

Second, the three *Graham* factors support the officers' use of force. Initially, the officers were investigating a report of domestic disturbance. Domestic violence can result in one of several crimes, ranging from misdemeanors to felonies. Albright had a duty to investigate and verify which, if any, crimes had been committed. Upon his arrival and throughout his interaction with Martinez, Albright was unable to complete his investigation due to Martinez's refusal to cooperate. Using force to investigate and prevent violent crimes is reasonable and the first *Graham* factor weighs in favor of the officers.

Next, Martinez posed a potentially serious threat to the officers and/or Ker. For all the reasons described above—the 911 call and the personal interactions between the officers and Martinez (including threats of harm)—Albright and Anderson legitimately believed that Martinez posed a threat to their safety (and/or the continuing safety of Ker). The second *Graham* factor weighs in favor of the officers.

Third and finally, Martinez continually resisted the officers. From the moment police arrived, Martinez resisted Albright's efforts to investigate the report of a domestic disturbance. Once Albright determined he needed to intervene and prevent Martinez from retreating further into the house, Martinez physically resisted. Martinez only stopped resisting after Anderson deployed his taser twice and threatened to use the taser again. The third *Graham* factor also weighs in favor of the officers.

### 3. Totality of the Circumstances

The final consideration also supports the officers. Under the totality of the circumstances, the officers' actions were appropriate. Faced with a belligerent and aggressive person who retreated into his home with access to firearms, the officers had to act quickly to prevent any harm to themselves or the reported victim of a domestic disturbance.

Martinez refused to comply and showed increased aggression as the situation unfolded. The officers use of force—specifically the use of a taser in dart mode—was appropriate under the circumstances and did not constitute excessive force.

In short, summary judgment is appropriate on Martinez's excessive force claim.

E. *Monell* Claims

Next, Defendants assert the City of Idaho Falls is not liable under any theory of *respondent superior* because Martinez cannot establish a genuine issue of fact based upon direct liability. The law is clear that governmental entities cannot be vicariously liable in a § 1983 action. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978).

Under *Monell*, the only time a party can seek liability against a municipality is if he or she establishes that: (1) he or she was deprived of a constitutional right; (2) the municipality (or entity) had a policy or custom; (3) the policy or custom amounted to deliberate indifference to his or her constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *See Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001) (cleaned up).

Not all policies or customs present in written form. An unwritten policy or custom can satisfy the third *Monell* element if the Plaintiff shows the policy or custom was so "persistent and widespread" that it essentially constituted a "permanent and well settled city policy." *Monell*, 436 U.S. at 691. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). A municipality's "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability." *Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997) (cleaned up).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

In this case, as discussed above, there was no constitutional violation and Martinez's *Monell* claim fails for that reason alone.

Setting that aside, Martinez has only made one conclusory allegation against the City to support his *Monell* claim. Martinez contends the alleged violations of his constitutional rights "were caused by official City of Idaho Falls policies permitting officers to enter a residence without a warrant or probable cause and arrest a nonviolent resident with the use of a taser and rear naked chokehold, and permitting officers to arrest and charge suspects for which no probable cause exists but for 'contempt of cop.'" Dkt. 4, at 4. This allegation is exaggerated at best. As explained, it is not clear Martinez was placed in any type of choke hold—*see supra* note 7—but even if he was, the officers' actions in entering Martinez's home and using force to subdue him were reasonable and necessary given his language, behavior, and obstruction.

Martinez also alleges the Idaho Falls Police department had an unconstitutional policy or standard operating procedure ("SOP") of making warrantless entries into homes without an adequate factual basis to believe an occupant needed protection from imminent injury. Martinez relies on deposition testimony from Idaho Falls Police Chief Bryce Johnson that seems to suggest the department had a policy allowing officers to enter a home without any suspicion of an actual or imminent injury in violation of the Fourth Amendment. Dkt. 43, at 17–18. But the testimony Martinez cites has been taken out of

context. Chief Johnson's testimony, taken as a whole, makes clear officers are to consider a variety of factors when deciding how to proceed with a warrantless search—including but not limited to actual or imminent injuries—and there were no department SOPs that contradicted general Fourth Amendment protections and principles. *See* Dkt. 43-3, at 247–51. Chief Johnson's point was that officers look at the totality of the circumstances and make the most reasonable decision they can, and that *sometimes* warrantless entries occur without indications of actual or imminent injuries—because other factors support the warrantless intrusion. *Id*.

Martinez has not persuasively called into question the City of Idaho Falls's SOPs or any other departmental policies sufficient to mount a *Monell* claim. Each of the City's (and department's) polices appear to be in accordance with applicable federal and state law. They illustrate that officers were trained and provided with guiderails to ensure the protection of themselves, the community, and everyone's constitutional rights. Martinez has not produced any evidence to suggest the City of Idaho Falls had an unconstitutional policy or a history of unconstitutional conduct. As such, summary judgment is appropriate on Martinez's *Monell* claim against the City of Idaho Falls.

## F. State Law Claims

In his Complaint, Martinez references negligence and trespass which are state law causes of action under Idaho law. Dkt. 4, at ¶ 17. A prerequisite to bringing such claims is compliance with the Idaho Tort Claims Act ("ITCA"). *Bliss v. Minidoka Irrigation Dist.*, 468 P.3d 271, 282 (2020).

Martinez submitted a notice of tort claim on or about October 20, 2021. Dkt. 33-3, at 11. That notice, however, did not include a claim of negligence or trespass. Because Martinez did not comply with the ITCA, he cannot pursue these claims in this case. *See Bliss*, 468 P.3d at 283 ("Compliance with this notice requirement is mandatory and failure to observe it results in dismissal of the claim.").

Furthermore, at oral argument Martinez's counsel acknowledged that, because he did not address these claims in response to Defendant's Motion for Summary Judgment, they are now abandoned.

In sum, to the extent Martinez pleads any state claims in the instant federal case, summary judgment is appropriate in Defendants' favor, as each of those state claims are barred by the ITCA and/or have been abandoned at this point.

## V. CONCLUSION

Cases that review law enforcement officers' actions are often difficult. Not so here. In this case, a person who was potentially engaged in a domestic-related crime was yelling obscenities and acting erratically towards officers and his spouse. He was known to have firearms in the home and refused to comply with efforts to deescalate the situation. The totality of the circumstances supports the officers' actions.

Upon review, and construing all facts in Martinez's favor, there is no material dispute that the Defendants' actions were reasonable under the circumstances. Albright and Anderson did not violate Martinez's constitutional rights because exigent and emergent circumstances existed. They are also entitled to qualified immunity for their actions. All of Martinez's other claims fall in tandem.

Summary judgment is appropriate in Defendants' favor on all of Martinez's claims.

## VI. ORDER

1. Defendants' Motion for Summary Judgment (Dkt. 33) is GRANTED.

2. The Court will enter Judgment in accordance with Federal Rule of Civil Procedure 58.

DATED: September 29, 2025

David C. Nye
Chief U.S. District Court Judge